UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SIDNEY R. MILLER, derivatively on behalf of 53rd-Ellis Currency Exchange, Inc., California-Peterson Currency Exchange, Inc., Cicero-Foster Currency Exchange, Inc., Cicero-Armitage Currency Exchange, Inc., Stony-79th-South Chicago Currency Exchange, Inc., Racine & 51st Currency Exchange, Inc., 67th & Champlain Currency Exchange, Inc., Cottage Grove & 43rd Currency Exchange, Inc., Cottage Grove & 51st Currency Exchange, Inc., Drexel & 47th Currency Exchange, Inc., and New Morton Grove Currency Exchange, Inc., <br><br>Plaintiffs, <br><br>vs. <br><br>MICHAEL E. FRYZEL, BARRY SHACK, ILLINOIS DIVISION OF FINANCIAL INSTITUTIONS, and TERENCE KEENAN, <br><br>Defendants, | 12 C 10160 <br><br> Judge John Z. Lee |

## MEMORANDUM OPINION AND ORDER

This derivative shareholder suit is but the most recent in a series of cases brought by Plaintiff Sidney Miller ("Miller") on behalf of eleven wholly-owned currency exchange corporations—53rd-Ellis Currency Exchange, Inc., California-Peterson Currency Exchange, Inc., Cicero-Foster Currency Exchange, Inc., Cicero-Armitage Currency Exchange, Inc., Stony-79th-South Chicago Currency Exchange, Inc., Racine & 51st Currency Exchange, Inc., 67th & Champlain Currency Exchange, Inc., Cottage Grove & 43rd Currency Exchange, Inc., Cottage Grove & 51st Currency Exchange, Inc., Drexel & 47th Currency Exchange, Inc., and New Morton Grove Currency Exchange, Inc. (collectively, the "Miller currency exchanges"). Miller alleges that Defendants Michael E. Fryzel ("Fryzel"), Barry Shack ("Shack"), Terrence Keenan

1

("Keenan"), and the Illinois Division of Financial Institutions ("IDFI") conspired to facilitate the imposition of a receivership on and liquidation of the Miller currency exchanges, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*. Dkt. 35. In the amended complaint, Miller also advances an individual RICO claim against Defendants "as a third-party beneficiary of [the Miller currency exchanges'] contracts." *Id*. ¶ 4. In addition to opposing Defendants' motions to dismiss, Miller also seeks leave to amend and correct his complaint. Dkt. 77, 82. For the reasons set forth below, the Court grants Defendants' motions to dismiss with prejudice and denies Miller's motions for leave to amend.

## Background

In considering the motions to dismiss, the Court assumes the truth of the amended complaint's factual allegations, though not its legal conclusions. *See Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012). In doing so, the Court must consider the amended complaint, along with any "documents attached to the [amended] complaint, documents that are critical to the [amended] complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Miller's briefs opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). All reasonable inferences are to be drawn in Miller's favor. *See Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 729 (7th Cir. 2013) (when evaluating whether plaintiffs in a derivative suit have adequately pleaded complaint, "any inferences reasonably drawn from the factual allegations of the complaint must be viewed in the light most favorable to the plaintiffs") (quoting *In re Abbott Labs. Derivative S'holder Litig.*, 325 F.3d 795, 803 (7th Cir. 2003)).

Miller is the sole shareholder, owner, director, and officer of the Illinois-based Miller currency exchanges. Dkt. 35 ¶¶ 1, 4. Beginning in 1990, Fryzel, an attorney, provided legal services to Miller and his currency exchanges. *Id.* ¶ 13. Fryzel entered into service agreements with each of the eleven currency exchange corporations and acted as each corporation's registered agent. *Id.* ¶¶ 11H, 12. Until 2002, non-party Corus Bank had extended generous amounts of credit to the Miller currency exchanges, allowing the exchanges to overdraw their accounts continuously in order to purchase and operate additional currency exchange stores. *Id.* ¶ 19. On September 1, 2002, Corus Bank terminated Michael Lynch, the vice president for all currency exchange operations since 1986, who had worked closely with Miller in extending him credit. *Id.* ¶ 19. Keenan, a longtime Corus Bank mortgage lending officer, was hired as Lynch's replacement. *Id.* ¶ 20.

On October 31, 2002, Miller met with Fryzel, Keenan, another Corus Bank executive, an accountant, and a trial attorney. *Id.* ¶ 21. At the meeting, Corus Bank demanded that Miller immediately sell his currency exchanges and repay his loans to Corus Bank. *Id.* Miller alleges that Corus Bank wanted to expedite recovery of the credit it had extended to Miller in order to "mitigate the threat of its liability for lending under questionable banking practices if exposed during Federal bank examiner inquiries during its annual review or afterward." *Id.* ¶ 6. On December 12, 2002, Fryzel sent Miller a letter purporting to terminate his legal representation of the currency exchanges. *Id.* ¶ 14. The letter stated that Fryzel would hold the currency exchange records in his possession until Miller paid the alleged unpaid balance of the fees ($38,074.73). *Id.* ¶ 15.

On January 17, 2003, Corus Bank and IDFI held a meeting without Miller's knowledge regarding the currency exchanges. *Id.* ¶ 22. Shortly thereafter, on February 4, 2003, Corus Bank

sent Miller a letter listing the amounts that had been overdrawn with respect to the currency exchange accounts and informing him that it would immediately cease "shipping cash" to the currency exchanges. *Id*. ¶ 23. Despite Miller's request that he do so, Fryzel did not prepare a response to Corus Bank's letter. *Id*. ¶ 21. That same day, Corus Bank transferred $1,260,000.00 from the Miller currency exchanges' operating accounts—typically used to pay for money order clearings—to "either other Corus accounts for [each] store or to other stores' Corus accounts or to non-store Corus accounts." *Id*. ¶¶ 23, 31A. These transfers reduced each store's operating account to a value of zero and allegedly "diverted public money order funds held in trust for redemption." *Id*. ¶ 30A. On February 6, 2003, IDFI examiners conducted a field examination of each of Miller's currency exchanges. *Id*. ¶ 24. Allegedly, the transfers were part of Corus Bank's scheme "to establish impairment throughout the 11-store Miller chain" at the IDFI examination, which would then justify IDFI's imposition of the receivership and allow Corus Bank to seize control of the Miller currency exchanges' $1,441,000.00 aggregate money order surety bond proceeds through the receiver, allegedly with Fryzel's legal assistance. *Id*. ¶ 31B.

On February 15, 2003, Miller attempted to deposit $125,000.00 in currency exchange money orders at LaSalle Bank, where Miller's auditing corporation had an account containing emergency cash for store operations. *Id*. ¶ 25. After speaking to Keenan, a former LaSalle Bank officer, who stated that "questionable practices" were occurring with respect to the Miller currency exchange accounts, LaSalle Bank informed Miller that his account was being closed and that no deposits would be accepted. *Id*.

On February 24, 2003, Fryzel filed a breach of contract action for the $38,074.73 unpaid balance against Miller and the currency exchange corporations. *Id*. ¶¶ 16-17. The next day, on February 25, the IDFI director issued eleven orders placing each of the Miller currency

exchanges into receivership pursuant to the Currency Exchange Act, 205 Ill. Comp. Stat. § 405, and appointed Shack as receiver. *Id*. ¶¶ 4, 16, 27. On February 27, 2003, Shack seized physical control of the stores. *Id*. ¶ 28. Shortly thereafter, Fryzel was retained as Shack's attorney, though Miller was unaware of this until he reviewed certain documents produced by IDFI in July 2004. *Id*. ¶¶ 12A, 30. On or about June 20, 2003, Fryzel accepted service at his Chicago office of the Illinois Attorney General's complaint for liquidation of the Miller currency exchanges. *Id*. ¶ 12A. Despite his role as Shack's attorney, Fryzel continued to serve as the registered agent of the Miller currency exchanges until 2007. *Id*. ¶ 12.

Miller further alleges that Shack and Corus Bank devised a "bifurcation scheme" in which the Miller currency exchanges' operating accounts were divided into a "receivership account" and the "old operating account"; the old operating account was used only to clear money orders, while the funds used to pay for clearing those money orders were transferred from the receivership account to the old operating account in large amounts twice a month, "and not daily so as to cover the money order clearings dollar-for-dollar during the prior half month." *Id*. ¶¶ 32B-32C. Corus Bank retained the net amount not transferred in the receivership account for other uses, "[p]resumably . . . includ[ing] re-imbursement for its claimed losses." *Id*. ¶ 32E. The alleged purpose of this "scheme" was for "Corus . . . to report to the Comptroller that the Receivership account was positive and that the old operating account negative balance was no worse, and would be cured, perhaps when the stores were sold and fresh cash was applied to cure the negative balance." *Id*. ¶ 32C. However, the scheme was undermined by policies instituted by Shack, such as the elimination of fees associated with the issuance of money orders and the requirement that longtime customers re-apply, which resulted in a decrease in old operating account balances. *Id*. ¶ 32D.

In a letter dated September 20, 2003, Corus Bank gave Shack instructions for recovering store cash after the termination of cash shipments and credit to the Miller currency exchanges. *Id*. ¶ 33A. On September 24, 2003, Miller and three attorneys (not including Fryzel), met with IDFI's and Corus Bank's counsel and an assistant attorney general to discuss the September 20 letter. *Id*. ¶ 33. Corus Bank offered to continue cash shipments to the Miller currency exchanges "if Miller would agree to promptly convey [his] ownership to Corus" for compensation in the amount of 25% of the profits of sale. *Id*. ¶ 33D. Fryzel allegedly conspired with Corus Bank "by failing to oppose Corus['s] intention to 'clean out the store.'" *Id*. ¶ 33G.

On October 4, 2003, Shack closed seven Miller currency exchanges (California-Peterson Currency Exchange, Inc., Cicero-Foster Currency Exchange, Inc., Stony-79th-South Chicago Currency Exchange, Inc., Racine & 51st Currency Exchange, Inc., Cottage Grove & 43rd Currency Exchange, Inc., Cottage Grove & 51st Currency Exchange, Inc., and New Morton Grove Currency Exchange, Inc.), and discharged fifteen employees. *Id*. ¶ 34. On or about December 22, 2003, Continental Casualty Company ("CCC") issued $1,441,000.00 in IDFI-endorsed checks to Corus Bank, allegedly "in settlement of Corus Bank's March 20 claim for the Miller currency exchange Surety Bond proceeds." *Id*. ¶¶ 35, 35A. Corus Bank claimed that it lost more than $5 million as a result of paying the daily Miller currency exchanges' money order clearings between February 7, 2003 and March 15, 2003. *Id*. ¶ 35A.

Around January 31, 2005, CCC filed suit in Cook County Circuit Court seeking indemnification from Miller personally for the $1,441,000.00 amount. *Id*. ¶¶ 35E, 35H. On March 2, 2005, the Cook County Circuit Court ordered the statutory liquidation of nine of the currency exchanges. *Id*. ¶¶ 4, 35Q. At the time the amended complaint was filed, all eleven of

the Miller currency exchange corporations had been administratively dissolved for failure to pay franchise taxes to the Illinois Secretary of State. *Id*. ¶ 11E.

In 2007, Fryzel closed his Chicago law practice without providing notice to Miller or the Secretary of State. *Id*. ¶ 12C. Prior to the imposition of the receivership in 2003, Fryzel would regularly pass along annual Illinois Franchise Tax Report forms to Miller for him to complete and mail to the Secretary of State along with his payment. *Id*. ¶ 12F. After 2003, Miller did not receive any tax forms from Fryzel and presumed that the receivership had assumed responsibility for the remittances. *Ibid*. In 2010, however, Miller discovered that the receiver had ceased paying franchise tax fees for the currency exchange corporations, resulting in their liquidation as well as their standing to file pending check collection actions in Illinois. *Ibid*. Fryzel's defunct law office address was still listed as the registered agent contact. *Id*. ¶¶ 12C, 12G. By this time, the accumulated unpaid franchise taxes, penalty fees, and interest exceeded $10,000.00. *Id*. ¶ 12G.

In February 2007, Miller began receiving extensive discovery documentation from CCC in connection with a document production request Miller tendered to CCC as part of the Circuit Court action. *Id*. ¶¶ 32, 35H-J. This production of documents allegedly included an agreement between IDFI, Corus Bank, and CCC to share with CCC any recoveries in pending actions against Miller once Corus Bank received full recovery for its losses. *Id.* On November 3, 2008, Miller filed a criminal RICO complaint with the Office of the United States Attorney for the Northern District of Illinois. *Id*. ¶ 37. The Office responded on or about November 25, 2008, that it would not take action without the FBI's recommendation. *Ibid*. On or about December 17, 2008, Miller met with the FBI and was informed that an agent would enter his information into a database of potential claims. *Id*. ¶ 38. In or about July 2009, Miller met with two FBI

7

agents who explained that "Miller might have an action for civil RICO but made no commitment for further action as [to] criminal RICO." *Id*. ¶ 39.

On September 11, 2009, Corus Bank was seized in an FDIC receivership. *Id*. ¶ 40. Miller contacted the FDIC for claim forms and filed his proofs of claim for each of his currency exchanges, his auditing corporation, as well as in his individual capacity, on December 17, 2009. *Ibid*. Miller finished filing his claims with the FDIC on May 11, 2010, and his claim was denied on May 18, 2010. *Id.* ¶ 41. However, Miller was not informed of the denial of his claim until August 13, 2010. *Id*. On August 16, 2010, Miller filed a petition for judicial review of the denial of his claim in the Northern District of Illinois, but that case was dismissed on September 29, 2011. *Id*. ¶¶ 42-43; *see Miller v. F.D.I.C.*, 2011 WL 4538685 (N.D. Ill. Sept. 29, 2011), *aff'd*, 738 F.3d 836 (7th Cir. 2013).

## Discussion

In his response to Fryzel's motion to dismiss, Miller clarified that he is bringing this suit *only* as a derivative shareholder action under Federal Rule of Civil Procedure 23.1, and not also as an "individual," as pleaded in the amended complaint. *Compare* Dkt. 35 at 1 *with* Dkt. 85 at 3 ("Miller . . . brings the action as a shareholder derivative action under FRCP 23.1. Miller asserts that he has third-party beneficiary standing as to contracts of the corporations but does not pursue that standing in this action."). The Court may consider this representation in Miller's response brief to be a judicial admission. *See U.S. v. One Heckler-Koch Rifle*, 629 F.2d 1250, 1253 (7th Cir. 1980) (citing 10 C. Wright & A. Miller, Federal Practice and Procedure § 2723 at 490 (1973)); *Mopex v. Barclays Global Investors*, No. 01 C 5976, 2003 WL 880996, at *2 (N.D. Ill. Mar. 5, 2003) (construing statement in response to motion to dismiss as judicial admission).

Thus, the Court proceeds with the understanding that Miller is not bringing suit in his individual capacity, but rather as a shareholder on behalf of the eleven currency exchange corporations.

Defendants have separately moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6). Dkt. 44, 49, 73, 80. As part of their motions, Fryzel and Keenan advance the argument that the amended complaint fails to adequately allege demand futility as in pleading shareholder derivative claims under Federal Rule of Civil Procedure 23.1(b)(3)(B); Shack has adopted this argument as well. Dkt. 44 at 4-5, ¶¶ 20-25; Dkt. 74 at 12-13; Dkt. 81 at 13. The IDFI's motion asserts only that it is immune from suit pursuant to the Eleventh Amendment. Dkt. 49 at 3. The Court will consider the motions advanced by Fryzel, Keenan, and Shack together, and turns to them first.

### A. Fryzel, Keenan, and Shack's Motions to Dismiss

Fryzel, Keenan, and Shack have moved to dismiss the amended complaint on the grounds that Miller has not adequately pleaded a shareholder derivative claim under Rule 23.1(b) and, alternatively, that the amended complaint fails to state a claim upon which relief can be granted. Docs. 44, 73, 80. Because the Court concludes that Miller has failed to adequately plead that he made a demand on the corporation or that it would have been futile to do so, the Court will dismiss the complaint without reaching Defendants' alternative arguments.[1]

Federal Rule of Civil Procedure 23.1(b), which establishes the pleading requirements for federal court derivative actions, provides that a complaint must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). The requirements of Rule 23.1 are

---

[1] Several of Defendants' Rule 12(b)(6) dismissal arguments will be discussed, however, in connection with Miller's motion for leave to file a second amended complaint.

applicable to RICO actions brought derivatively. *See Gomes v. Am. Century Cos., Inc.*, 710 F.3d 811, 816 (8th Cir. 2013) (state law demand requirement for derivative actions "does not frustrate the federal policies underlying RICO," so court applied Maryland law to determine whether demand excused); *Levine v. Prudential Bache Props., Inc.*, 855 F. Supp. 924, 940 (N.D. Ill. 1994) (Rule 23.1 demand requirement applicable to RICO claims). Here, Miller concedes that "[he] has not made the effort to seek the corporate directors' or other shareholder's [*sic*] to act in this matter" but maintains that demand would have been futile and therefore is not required under Rule 23.1(b)(3)(B). Dkt. 35 at ¶ 11B.

Because the eleven currency exchange corporations were incorporated under the laws of Illinois, the Court applies Illinois law to determine whether the requisite demand may be excused.[2] *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96-98, 108-09 (1991) (noting that the demand requirement is substantive and thus is governed by state law with respect to state law causes of action, and holding that federal common law incorporates state demand futility law with respect to federal causes of action); *In re Abbott Labs. Derivative S'holder Litig.*, 325 F.3d at 803. "Illinois case law follows Delaware law in establishing demand futility requirements and uses the test to determine demand futility set forth in *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000) (overruling abuse of discretion standard of review on Rule 23.1 motion to dismiss derivative suit)." *Id.*; *see Spillyards v. Abboud*, 662 N.E.2d 1358, 1366 (Ill. App. Ct. 1996).

"The *Aronson* test applies to claims involving a contested transaction *i.e.*, where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties.

---

[2] More precisely, because "the function of the demand futility doctrine . . . is a matter of substance, not procedure," federal law will "govern[] the degree of detail that the plaintiff must furnish when" it explains its reasons for not making a demand," but "state law will determine whether those reasons are sufficient." *Westmoreland Cnty.*, 727 F.3d at 722.

10

That test requires that the plaintiff allege particularized facts creating a reason to doubt that (1) the directors are disinterested and independent or that (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) (footnotes, brackets, and internal quotation marks omitted). This test is not applicable here, as the amended complaint does not allege that Miller, as the sole director, made a business decision in breach of his fiduciary duties.

Here, Miller's argument that demand would have been futile rests upon his contention that the directors were *prevented* from pursuing this action because they have been deprived of their books and records, a fact confirmed by . . . Fryzel's December 12, 2002 letter admitting he was retaining the books and records until the alleged unpaid fees were paid." Dkt. 85 at 3, ¶ 5(a). Presumably Miller is alleging that it would have been futile for him to make a demand as sole director of the currency exchange corporations because he did not possess the necessary information. But the Court fails to see how the lack of books and records in any way hindered Miller's ability to bring this suit as director of the currency exchange corporations. The books and records at issue are limited to the finances of the currency exchange corporations and were not necessary for Miller to advance a RICO claim based on conspiratorial activities of Defendants. In fact, even without the benefit of such books and records, Miller has been able to obtain financial information central to the RICO claim, as evidenced by the allegations in this derivative suit that Corus Bank transferred $1,260,000.00 from the currency exchanges' operating accounts to other Corus Bank accounts, Dkt. 35 at ¶¶ 23, 31A, and that Corus Bank received checks in the amount of $1,441,000.00, the equivalent of the currency exchanges' surety bond proceeds, *id.* at ¶¶ 35, 35A. There is no reason why, given his access to this financial information, Miller could not have brought the same or similar allegations against the

corporations in his capacity as director. *See*, *e.g.*, *Harris Bank Libertyville v. Romtech Am. Corp.*, No. 92 C 5456, 1992 WL 396775, at *5 (N.D. Ill. Dec. 23, 1992) (sole shareholder failed to allege demand futility).

Thus, the Court concludes that Miller has failed to satisfy the Rule 23.1(b) pleading requirements, and the amended complaint, accordingly, is dismissed as against Keenan, Fryzel, and Shack. *See Starrels v. First Nat. Bank of Chi.*, 870 F.2d 1168, 1172 (7th Cir. 1989) (affirming district court's dismissal of the complaint, with prejudice, where plaintiff failed to satisfy Rule 23.1(b)); *see also Morefield v. Bailey*, 959 F. Supp. 2d 887, 907 (E.D. Va. 2013) (dismissal with prejudice appropriate where amendment would be futile).

### B. IDFI's Motion to Dismiss

Additionally, IDFI moves to dismiss the complaint against it solely based on the fact that, as a state agency, it is immune from suit pursuant to the Eleventh Amendment. The Court agrees.

It is axiomatic that Eleventh Amendment immunity issues "may arise whenever a private party files a federal lawsuit against a state, a state agency, or a state official." *Kroll v. Bd. of Trs. of Univ. of Ill.*, 934 F.2d 904, 907 (7th Cir. 1991). Here, IDFI is a state agency, which is commonly treated as a state "for the purposes of the Eleventh Amendment." *Id.*, *see also Gleason v. Bd. of Educ. of the City of Chi.*, 792 F.2d 76, 79 (7th Cir. 1986) ("the State Board [of Education], an Illinois state agency, is therefore absolutely immune from liability under 42 U.S.C. § 1983."). Where an action is brought "by a citizen directly against an entity of the state, without naming state officials as defendants," the suit is barred by the Eleventh Amendment "regardless of the relief sought . . . unless the state has waived its immunity or Congress has overridden it." *Brunken v. Lance*, 807 F.2d 1325, 1329 (7th Cir. 1986).

Here, Illinois has not consented to suit, and Congress has not abrogated Illinois' Eleventh Amendment immunity with respect to RICO claims. *See Doe v. Bd. of Trs. of Univ. of Ill.*, 429 F. Supp. 2d 930, 941 (N.D. Ill. 2006) (RICO claims improper against state entity). As the Seventh Circuit has held, the principle of Eleventh Amendment immunity for state agencies is "so well established that it needs no further discussion here." *Hearne v. Bd. of Educ. of the City of Chi.*, 185 F.3d 770, 776 (7th Cir. 1999) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64-71 (1989); *Kroll*, 934 F.2d at 909; and *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1184 (7th Cir. 1982)). Miller's claims are barred, and the complaint is dismissed as against IDFI.[3]

### C. Miller's Motions for Leave to Amend the Complaint

Finally, Miller's motions for leave to file a second amended complaint [dkt. 77, 82] also are denied. The Court has thoroughly reviewed Miller's proposed pleadings and concludes that allowing further amendment would be futile. First, as Defendants correctly point out, the four-year statute of limitations applicable to RICO claims has run. While generally it is not appropriate to dismiss a complaint based upon the statute of limitations (an affirmative defense), a critical exception to this rule exists where a plaintiff expressly pleads himself out of court in his complaint. *See Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) (plaintiff pleads self out of court when he "admits all the ingredients of an impenetrable defense"). Similarly, where the statute of limitations has lapsed, it is appropriate for the Court to deny a motion for leave to amend a complaint on futility grounds. *See Rodriguez v. U.S.*, 286

---

[3] Recognizing the fatality of his claim against IDFI, Miller seeks to amend his complaint to substitute claims against five IDFI employees. However, Miller names four of the five employees in their official capacities only and such claims are also barred by the Eleventh Amendment. *Garcia v. City of Chi.*, 24 F.3d 966, 969 (7th Cir. 1994). As for the fifth defendant, against whom Miller wishes to proceed individually, such a claim may only proceed to the extent he pleads "that the defendant did something that is tortious independent of the office the defendant holds." *Walker v. Rowe*, 791 F.2d 507, 508 (7th Cir. 1986). No such allegations appear in Miller's proposed second amended complaint.

F.3d 972, 980 (7th Cir. 2002) ("A district court may properly deny a motion to amend as futile if the proposed amendment would be barred by the statute of limitations."); *King v. One Unknown Fed. Corr. Officer*, 201 F.3d 910, 914 (7th Cir. 2000) (amended complaint futile where claim barred by statute of limitations). Because Miller expressly alleges in his proposed amended complaint that he has been on notice of his RICO claim since, at the latest, November 3, 2008, he has admitted the elements of the statute of limitations defense.

Specifically, Miller's proposed second amended complaint echoes his allegations in his amended complaint that in November 2008, Miller filed a RICO "Complaint" with the U.S. Attorney's Office in the Northern District of Illinois. *See* Dkt. 35 (Am. Compl.) at ¶¶ 36-37 ("during the summer of 2008 . . . Miller began research of criminal RICO to determine grounds for a complaint [and] . . . [o]n November 3, 2008 Miller filed a Complaint with the Office of the United States Attorney for the Northern District of Illinois"); Dkt. 77 (Proposed 2d Am. Compl. Ex. 1) at ¶ 11(i) (certain events "significance as RICO predicate acts was not recognized until . . . 2008 . . . [and] [i]n November, 2008 Miller filed his Complaint with the Northern Illinois District U.S. Attorney in the belief that criminal RICO conduct was present and should be timely pursued."). More than four years later, on December 19, 2012, Miller filed the instant lawsuit. Dkt. 1. The "filing" of his RICO "complaint" with the U.S. Attorney is sufficient evidence that Miller was on notice of his potential RICO claim by November 3, 2008. *See, e.g., Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004) (RICO "cause of action accrues when the plaintiff knew or should have known that it had sustained an injury.").

The only way that Miller's claim can survive in light of these allegations is if it is equitably tolled. *U.S. v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000) (equitable tolling of

statute of limitations "is granted sparingly," and occurs only where "[e]xtraordinary circumstances far beyond the litigant's control . . . prevented timely filing."). To that end, Miller argues (within the text of his proposed amended complaint) that the statute of limitations should be tolled because the U.S. Attorney allegedly would not act on his RICO complaint until the FBI weighed in on its merits, and the FBI did not conclude its investigation until August 2009. This argument is unavailing. The standard is whether Miller knew or should have known that he had "sustained an injury," not whether Miller thoroughly understood the precise nature and contours of his RICO claim, or whether the government planned to bring a criminal action. *See Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009) ("A [RICO] plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim."). Thus, Miller's RICO claim is not equitably tolled, and the applicable four-year statute of limitations has run.

Second, the Court notes that Miller's proposed pleading remains a jumble of names, dates, and legal citations, rendering it difficult to discern from the pleading as drafted what exactly Miller is alleging. In any event, the Court cannot conclude that he has stated a plausible RICO claim, which requires a plaintiff to allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Miller fails to meet this burden.

To illustrate just one of the numerous defects in Miller's proposed amended complaint, the Court notes that he fails to properly plead the existence of an "enterprise." In order to plead an enterprise, a plaintiff must plead the existence of an "enterprise-like structure, such as that of a cartel . . . ." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 804 (7th Cir. 2008). In

*Limestone Dev.*, the Seventh Circuit upheld the district court's dismissal of a RICO claim, in part for failure to properly plead the existence of an enterprise. In order to establish that an enterprise existed, a plaintiff must allege "'an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making.'" *Id.* at 805 (quoting *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995). As that court explained, "[n]owhere in the complaint does one find anything to indicate a structure of any kind. There is no reference to a system of governance, an administrative hierarchy, a joint planning committee, a board, a manager, a staff, headquarters, personnel having differentiated functions, a budget, records, or any other indicator of a legal or illegal enterprise." *Id.* at 804. Likewise, here, Miller's proposed amended complaint is devoid of even a "hint of a structure," *id.* at 805, sufficient to suggest that Defendants engaged in the requisite "enterprise" necessary to state a RICO claim.

"A district court does not abuse its discretion in denying leave to amend if the proposed repleading would be futile." *Garcia*, 24 F.3d at 970 (citations omitted); *see also Tribble v. Evangelides*, 670 F.3d 753, 761 (7th Cir. 2012) ("District courts have broad discretion to deny leave to amend . . . where the amendment would be futile."). Because the proposed amended complaint, representing Miller's third attempt to plead his RICO claims, still fails to satisfy the operative pleading standards of Fed. R. Civ. P. 8(a), the Court denies the motions for leave to amend.[4] *See Adams v. City of Indianapolis*, 742 F.3d 720, 734 (7th Cir. 2014) (denial of motion to amend due to futility appropriate where amended complaint still "pleaded in wholly

---

[4] The Court notes that this action is but the latest in a string of approximately 20 lawsuits involving Mr. Miller that arise out of the failure of the currency exchanges. These lawsuits have been brought in this Court, the U.S. Bankruptcy Court, and Cook County State Court, and have been ruled upon multiple times by federal and state appellate courts. Three federal cases between Miller and Fryzel in this Court alone previously were dismissed for lack of subject matter jurisdiction. *See* Case Nos. 10-cv-1622, 11-cv-2399, and 11-cv-2395.

conclusory terms" and failed the "plausibility threshold."); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1085 (7th Cir. 1997) ("The opportunity to amend a complaint is futile if the complaint, as amended, would fail to state a claim upon which relief could be granted.") (citation and internal quotation marks omitted).

**Conclusion**

For the reasons set forth above, Defendants Michael E. Fryzel, Barry Shack, Terrence Keenan, and the Illinois Division of Financial Institutions' motions to dismiss [dkt. 44, 49, 73, 80] are granted. The complaint is dismissed with prejudice. Plaintiffs' motion for leave to file an amended complaint and to correct the purported amended complaint [dkt. 77, 82] are denied. Civil case terminated.

Dated: July 15, 2014

Hon. John Z. Lee
United States District Judge